The last case this morning is Seagen v. Daiichi and AstraZeneca, 2024-1878. Ms. Horton. You're on the other side this time. Change tables. Good morning again, Your Honors. May it please the Court, Ms. Sarah Horton for appellant, and with me again are Mr. Stiles and Mr. Edwards. First, the Board should never have reached the merits of Eppley's petition because the 039 is not eligible for PGR. The 039 patent claims priority and shares a specification with pre-AIA application from 2004. During the prosecution, the examiner identified it as a pre-AIA patent and applied pre-AIA standards, but Congress only made post-AIA patents eligible for PGR. The legislative history is clear. Transition patents like the 039 that add new matter are not subject to PGR. Second, the final written description here, which came nearly three years after the petition was actually submitted by appellees and 10 months after the jury verdict, applied the wrong legal standards on enablement and written description, which was tied up exclusively with priority. In order to find a lack of enablement, the Board wrongly construed the claims to impose an efficacy requirement were nonexistent, and this Court has repeatedly rejected such constructions. The Board also improperly applied the Wands Factors by ignoring Seigent's state-of-the-art evidence, which showed that those of skill in the art would use the claimed ADCs without undue experimentation. With regard to written description and priority, the Board misstated the law. The test is not whether the written description would, quote, allow a person of skill to inherently, necessarily, or immediately envisage a tetrapeptide with only glycine or phenylalanine amino acids. That is not the standard. That is what the final written decision stated. In what context did the Board say that? Did the Board say that in the context of responding or analyzing Dr. Pertozzi's statements? Yes, Your Honor. The Board said that after it had gone through a description of— I don't know if two wrongs make a right here, but my understanding of what the Board was saying about Dr. Pertozzi was talking about modifying what was in the disclosure to reach a species that would be covered by the claims. And the Board was trying to say that's not the correct way to think about a written description analysis. And there wasn't anything in Dr. Pertozzi's presentation that really communicated that she believed that the inventor had, in fact, disclosed any compound that fits within the claim, let alone the entire subgenus. Well, Your Honor, I think that regardless of where that statement fell, it is a heightened view of what written description requires. Written description requires here, according to the case law in Ariad, that the application reasonably convey to one of ordinary skill in the art that the inventors possessed the claimed invention, and not that they had to inherently, necessarily, or immediately envision it. So if the Board was reviewing her testimony, Dr. Pertozzi's testimony, or the evidence presented through the lens of inherently, necessarily, or immediately envisioned, then that is error and was requiring more of a written description. Chemistry is a precise science. If we're talking about describing a chemical, that test isn't met by describing something else and saying, well, we've reasonably disclosed it. I think, Your Honor, that the test is that the application would reasonably convey to one of ordinary skill in the art that there was possession. I won't keep asking you what I asked you earlier. Okay. So the specification here does, as I was speaking earlier, does specify the general chemical formula, does specify the peptide linker may be a tetrapeptide, does disclose glycine and phenylalanine as two of the 39 amino acids that could be used in the tetrapeptide linker. Dr. Pertozzi explained the specification would have pointed the person of ordinary skill in the art to a glycine phenylalanine-only tetrapeptide at Appendix 12-12004-2006. Setting aside the heightened and erroneous inherently, necessarily, or immediately envisioned legal standard used by the Board to view the evidence, Appley failed to show that the disclosure did not reasonably convey to a person of ordinary skill in the art that the inventors had possession of the claimed subject matter. Appley's argued that Siegen inventors had not made or tested the ADCs with a glycine or phenylalanine tetrapeptide prior to the filing and that there are no working examples. But of course, neither of those are required to satisfy the written description as we've seen in this court's case law in the Allergan case and in the Union Oil case. Allergan, in fact, states that no rigid requirement that the disclosure contain either examples or reduction to practice. So then blazemarks are needed. Excuse me? So then blazemarks are needed. Correct. And there was evidence of blazemarks from Dr. Bertozzi, which the court declined to credit based on its- The Board at 821 quotes Dr. Bertozzi in a block quote. And the last sentence of that block quote says, the patent's disclosure would have motivated the POSA to reevaluate art that used tetrapeptide motifs such as glyphylugly, including the use of such motifs in products, which is where glyphylugly first appeared in the literature. To me, that reads like Dr. Bertozzi relying on a motivation to modify GFLG to make GFFG. So, Your Honor, I think there where the Board- What was she getting at when she used the word motivated? I think what she's getting at is that she opined that the glyphy-only tetrapeptides were included within the scope of the disclosure and that the patent contained blazemarks pointing to that embodiment. The POSA would understand that the Siege and Inventors possessed that claim at the time of filing. She discussed at Apex 12062 that the 039 patent and its priority non-provisional applications all include within their disclosures a description of a tetrapeptide that consists of amino acids with R-19 groups of either hydrogen, glycine, or benzophenylalanine. She further discussed at 12-12065 that the specifications description of the amino acid units plainly includes the tetrapeptides consisting of glycine or phenylalanine as part of the invention. She further discussed at 12066 that a POSA would have understood, therefore, that the invention included these ADCs with the glyphy-only tetrapeptides. The court did not substantively grapple with that testimony. Instead, the board used this heightened legal standard to view it, which we think was inappropriate and error by the board. What do we do with the interplay between this case and the district court case? We have different decisions involving the same claims. What should we do about that? Our view is that the PGR never should have been instituted, and that the PGR of a transitional patent where no new matter is added was inappropriate, and there that the court should remand the PGR with instructions to dismiss it because there was never standing to hear it in the first place. Of course, the jury verdict is on a different standard here. The jury verdict, there are issues of substantial evidence, and whether or not the jury heard evidence, that would allow it to come to the verdict that it did. Of course, in our papers and as I was talking about earlier, we think that... You're saying we're not by necessity facing a moot issue? A moot issue? Yes. Does one render the other one moot? I'm sorry, I didn't hear the last part. Does one of the cases render the other case moot, the board decision? I think a little bit of that, Your Honor, depends on timing. So the jury verdict occurred 10 months before the final written decision in the PGR, and these cases are here today as companion appeals, so we are arguing them here today together. So if the timing is such that, for example... If I could just follow up. If we were to reverse the district court appeal, finding the patent invalid for some reason, then would that moot this PGR appeal? And likewise, if we were to affirm the PGR appeal, would that moot the district court appeal? I'm not sure about the exact terminology moot, but I will tell you that if this court were to reverse and hold the patent invalid in the jury verdict in the Texas appeal that came first, which of course we would disagree with, if that happened, there would be no judgment to collect and no judgment going forward, subject to other appeal rights, of course, such that the outcome of the PGR appeal might not matter. Conversely, if this court, for example, affirmed the PGR appeal, then depending on the timing of that, that might have an impact on the district court appeal as well, even if this court affirmed the district court appeal. Does that make sense? I'm trying to figure out if I've answered your moot question. I guess the question is, would this court need to even do anything with the second case? I mean, the patent would in effect be gone, and so therefore there's no need for this court to go further and write a second opinion on the merits for the second appeal. I don't want to prejudge whether or not the court feels like it needs to write an opinion on an issue, of course, but practically speaking, if this court invalidates the patent on either appeal, depending on the timing, then the case would be over. I see I'm eating into my rebuttal time. We will save it for you. Thank you. Mr. Ratliff. Good morning, Your Honors. Good morning. May it please the Court, this case arises in the highly complex field of biotechnology, where a technically trained PTAT board was tasked with carefully evaluating an extensive amount of evidence. The board did exactly that. It analyzed the patent specification in detail. It made credibility determinations of the party's expert witnesses and weighed the evidence, and it correctly applied to law to arrive at findings supported by substantial evidence. I don't want to spend too much time on this, but I want to know very quickly, why was the PTAT so indecisive in the initiation here? Your Honor, I think when you look back at the record, what we see is that there were more than just the claims we have at issue in play here. So it wasn't a question, I'd say, from the board being indecisive as to the merits, because they were consistent on the merits, that there was at least more than one claim likely to be found unpatentable. It was questions and issues related to other considerations, such as FinTIF considerations at the time, and there was also a situation where CJIN took an adverse judgment because it disclaimed some claims. So that's why, Your Honor. And, Your Honors, CJIN has said a lot about the merits, so I want to start there, because when you look at the merits as to lack of enablement and lack of written description, it's easy to see why the board arrived at its decision. So, Your Honors, as to lack of enablement, the board considered the WANs factors and then found, by preponderance of the evidence, supported that there was undue experimentation to make and use the claimed ADCs. Now, what is the substantial evidence? Well, as to the factor of the breadth of the claims, we can look in the board's decision at page 48. The board found the claims extremely broad. Based on our expert, Dr. Lambert's testimony, who explained that the drug mortality limitation is not limited, it covers any compound, and it claims cover a vast genus of structurally and functionally disparate ADCs. As to the factor of working examples, looking at the board's decision, page 49 to 50, the board credited Dr. Lambert, his testimony where he explained that the working examples are all limited to these dolestatin-R-statin drug moieties, which the patent is centered on. And again, Your Honors, what we're talking about is just two drug moieties in the vast universe of drug moieties encompassed by the claimed ADCs. How vast is it? Is it 50? Is it 500? Is it 5 million? It's nearly limitless. It's countless. No one has even really attempted to put a number on it, Your Honor, because there are so many drug moieties. The physician's drug reference, which lists all drugs, is this thick. Probably tens of thousands. At least many millions, Your Honor, of drug moieties. And the board also noted, and this, again, at pages 49 and 50, that Sijin's expert, this is part of the substantial evidence, did not identify any working examples for what's in the claims. And they noted that the testimony of the four named inventors showed that they did not include any working examples. As to the other factor... Is the board's analysis perhaps infected by a non-claimed requirement of treating cancer? It seemed to want more than just intercleaving, intracellular cleaving in a patient. It wanted intracellular cleaving in a patient that would actually treat cancer or some other disease. Is that going too far, because the claim doesn't call for that? Your Honor, that would be going too far, but that's not what the board did. That's an argument that Sijin made about the board's analysis. When you look at the board's analysis, Your Honor, and when it talks about the intracellular cleavage limitation in a patient, they say that that is a limitation, and it's a limitation such that it can actually work in an ADC. But for intracellular cleavage, all it meant was internalizing into the cell. And we know that this is really a distraction and a red herring, Your Honor, because when we look at the enablement analysis that the board made in its decision, and we look at, for example, factors such as the amount and direction or guidance presented, that was focused heavily on whether or not there were drug moieties other than these dolestatin and r-statin moieties that the patent was centered on. If we look at, for example, the factors state of the art and unpredictability of the art, right there before our eyes on page 71, the board found that Dr. Lambert was more persuasive in demonstrating significant unpredictability in attaching drugs in their linkers. And the board even found that several of the references cited by Sijin's expert, Dr. Bertozzi, actually supported unpredictability of linking drugs, and that this unpredictability was highlighted by comparative art that she cited, where it showed that attaching linkers to an antibody was very different from attaching linkers to a drug moiety. And so even, Your Honor, on the quantity of experimentation, and this is at page 74 of the board's decision, they found Dr. Lambert to be more persuasive in demonstrating the large quantity of experimentation required to create a particular ADC while retaining intracellular cleavage as required by the claims. And that's on page 74. And, Your Honor, when we look at the decision, there's nothing showing that the board was having some requirement that intracellular cleavage would create some particular thing for therapeutic efficacy in a patient. So when you look at the WANS factors in total and the board's actual analysis, as I went through, Your Honor, it is focused so much on this unpredictability because the drug moiety is incredibly broad. Your Honors, this case, from an enablement perspective, is very much like the Amgen case. And even in the Amgen case, that was a situation where you had 11 examples that were within the scope of the claims. Here, we have zero examples within the scope. Now, Your Honors, I want to just get to the lack of written description analysis. And the board began this analysis on page 14 of its decision. And it showed that the board applied the correct standard. What did it do, Your Honor? It explained this court's decision in AREAC and found that both the petitioner and Dr. Lambert proved by preponderance of evidence that the 2004 priority applications lacked written description support for this tetrapeptide unit that was claimed in 2019. Now, again, what is this substantial evidence supporting the board's decision? Well, the board noted Dr. Lambert, how he explained that this 81-member tetrapeptide subgenus is not disclosed in the broader genus of amino acid units. And even if you limited the amino acid units to tetrapeptides and those covered by the claim, you would cover over 47 million species. And CSGEN's expert, Dr. Bertozzi, she didn't disagree with that. That's in the board's decision, pages 24 to 25. And CSGEN's expert even acknowledged that the provisional applications do not disclose an example of tetrapeptide with only glycine or phenylalanine amino acids. And one of the other pieces of substantial evidence that the board focused on, and this is at page 20 of its decision, is how Dr. Lambert pointed out the testimony of the named inventors, showing a complete lack of possession of ADCs with this claimed tetrapeptide and showing that there was no blaze marks, for example. And, Your Honors, this court's precedent has explained that for the written description requirement, inventor testimony can illuminate the absence of written description. And that's, for example, in the Newville Farms versus Dr. Reddy's case. And just completely separate from that, Your Honors, and it was mentioned earlier, Dr. Bertozzi's analysis, the board at page 24, it looked at that analysis after just considering everything in its totality. And when it looked at Dr. Bertozzi's analysis solely, and the board walks through this in pages 24 through 29, it was really the board saying that it was Dr. Bertozzi who was trying to give this impression of what a person of Oregon skill would understand from the specification. And the board didn't agree with that. They rejected it. With that, Your Honor, the PTO has been allotted some time, so unless Your Honors have any questions. Fine. Fine. I'll see my time. Thank you. You can set that for five minutes to give for the extra two. Is it Ms. Wine? Yes, Your Honor. Good morning, Your Honor, and may it please the court, for the Director of the U.S. PTO. This court may not review the board's threshold institution-based determination that post-grant review is available for the 039 patent. That is a final and non-appealable determination under Section 324E, and the court should hold that it lacks jurisdiction to review CESION's challenge to PGR eligibility. In other words, it relates to the decision to institute. Correct, Your Honor. And just like this court held in SIPCO, eligibility determination, be it in the context of CBM eligibility or PGR eligibility determination, the analysis is the same. This court may not review such a determination. What do you do in a situation like this where the decision to institute is tied up with a question that's a merits question? So, Your Honor, I'd like to acknowledge that there's that tension in this particular case, but the facts of this case cannot dictate the statutory construction here or the statutory interpretation here. It's entirely possible for the board to make a determination of PGR eligibility on, for example, one claim, and then have the review proceed on the remaining claims. So there isn't this 100% overlap substantively possible in every single case. And so the facts of this particular case, where the 2004 specification and the 2019 specification are substantively identical, should not dictate how we construe the PGR eligibility and the application of 324. You heard the question I asked of your friend about the indecision of the board to institute. Correct, Your Honor. I actually meant that for you. That's fine, Your Honor. Very quickly, just a quick answer. I anticipated that question, Your Honor. So I think what happened here, Your Honor, if you look at the procedural history, is that there were decisions to institute or de-institute and serial petitions for rehearing. At each step, the district court litigation or a different PGR on a subset of claims of this patent were differently placed. So the board's analysis and the board's application of its discretion to deny or to institute was different. The board was merely responding to the changed circumstances and the subsequent rehearing petitions that either side was filing. If I may just briefly touch on, unless the court has other questions on reviewability, I'll briefly touch on the test that CJIN is proposing. That test is entirely divorced from the statutory text. It does not contemplate what the statute says. The statute defines PGR eligibility by reference to effective filing date. So if Your Honor's reached that decision, which we don't believe the court has the power to, but if the court disagrees with us on reviewability, the correct test is the one that the board applied here, unless there are any other questions. Thank you very much. Thank you, Your Honor. Ms. Horton has a little rebuttal time. Thank you, Your Honors. To pick up right where Ms. Lynn just left off on the reviewability of the issue on PGR eligibility, I think she mentioned, as does the intervener's brief, that here there is a tension because the eligibility issue is so tied up with the merits issue. The history of this proceeding is important. It was discretionarily denied. It was instituted. It was reinstituted. The resulting final written decision canceling the claims came long after the jury verdict and nearly three years after the petition was filed. The issue of PGR eligibility came up over and over again in these decisions that led us to the final written decision. The question isn't PGR eligibility, it's whether it's appealable. Right. To the point of appealability, Your Honor, at the institution stage, the board's finding was that whether or not there was eligibility here and whether or not there was the transitional application of the 039, hearkened back to the earlier pre-AIA non-PGRable patent, was preliminary to be further examined during the trial. It said, for example, at Apex 595 in the first institution decision, that it is more likely than not that petitioner would demonstrate lack of enablement, etc., etc., and then said, for purposes of this decision, institution decision, we find that the 039 patent is eligible for post-grant review. Then also, before the final written decision, on the same enablement question at Apex 868, the board later acknowledged the possibility that the entirety of the evidence adduced at trial might lead us to a different conclusion. So there was no institution decision that was up or down, like the CIPCO case that the intervener relies on or like the Thrive or Click to Call. The issue in CIPCO where the issue on institution decision was, is this patent CBM reviewable, yes or no? That was a decision squarely decided for purposes of institution and nothing else. Here we have the situation where the merits and the eligibility question rose and fall together and will continue to be litigated after the institution decision and all the way to the final written decision. We could have been in a situation here, Your Honor, which we think is inappropriate, where the patent owner finds out only after going through an entire trial that the PGR never should have been instituted in the first place because the board lacked jurisdiction or standing to look at the transitional patent. I just want to say a few more things with my 19 seconds. We think that the board erred in its final written decision, finding that the non-enablement rests on improper claim construction and erroneous fact findings that impose therapeutic efficacy requirements into the 039 patent claims where none exist. The board also erred in finding a lack of written description when it misstated the law and held the siege into a higher standard than this court requires and demands for written description. For the same reasons, the 039 patent would satisfy the written description and has priority. That would mean that the patent is not anticipated then by the later reference as found by the final written decision. Thank you, Your Honors. Thank you both. The case is submitted and that concludes today's argument.